**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| BARBARA POWELL, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 04-0423 (RMU) |
| | : | | |
| v. | : | Re Document No.: | 69 |
| | : | | |
| JAMES B. LOCKHART III, | : | | |
| in his official capacity as Director | : | | |
| of the Federal Housing Finance Agency,[1] | : | | |
| | : | | |
| Defendant. | : | | |
| | : | | |

| | | | |
|---|---|---|---|
| BARBARA POWELL, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 07-1693 (RMU) |
| | : | | |
| v. | : | Re Document No.: | 12 |
| | : | | |
| JAMES B. LOCKHART III, | : | | |
| in his official capacity as Director | : | | |
| of the Federal Housing Finance Agency, | : | | |
| | : | | |
| Defendant. | : | | |
| | : | | |

<u>**MEMORANDUM OPINION**</u>

**GRANTING IN PART AND DENYING IN PART
THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.  INTRODUCTION**

This matter is before the court on the defendant's motion for summary judgment.  The

plaintiff claims that during her tenure of employment with the defendant, her supervisor

---

[1]    The prior named defendant in each of these actions was Alicia R. Castaneda, chair of the Federal Housing Finance Board ("FHFB").  The Housing and Economic Recovery Act of 2008 abolished the FHFB and transferred its functions, personnel and property to the Federal Housing Finance Agency ("FHFA").  *See* Pub. L. No. 110-289, §§ 1311-14, 122 Stat. 2654, 2797-99 (2008).  Accordingly, the court substitutes James B. Lockhart III, the current director of FHFA, for Castaneda.  *See* FED. R. CIV. P. 25(d).

discriminated against her on the basis of her gender, retaliated against her for participating in protected activity and created a hostile work environment based on gender discrimination and retaliation.

The court concludes that the plaintiff has presented sufficient evidence on some but not all of her claims to raise an issue of fact as to whether her supervisor unlawfully discriminated and retaliated against her.  Furthermore, the court concludes that a reasonable jury could determine that the plaintiff was subjected to a hostile work environment based on her gender and in retaliation for her involvement in protected activity.  Accordingly, the court grants in part and denies in part the defendant's motion for summary judgment.

## II.  BACKGROUND

### A.  Factual History

In February 1999, the plaintiff began working for the FHFB as Counsel to the Inspector General, Edward Kelley.  Declaration of Barbara Powell, dated December 5, 2008 ("Pl.'s Decl.") ¶ 4.  Her responsibilities included identifying and reviewing proposed agency policies and procedures, reviewing reports for legal sufficiency and researching legal questions for the agency.  *See* Pl.'s Opp'n, Ex. T at 2.  The position was part-time, calling for 40 hours per two-week pay period.  Pl.'s Decl. ¶ 4.  Soon after starting, however, the plaintiff began to work more than 40 hours every two weeks, with her hours fluctuating between 40 and 80 hours per two-week period depending on Kelley's need.  Pl.'s Decl. ¶ 6.  She and Kelley ultimately reached an informal agreement that she would work 72 hours every two weeks.  *Id.* at ¶¶ 6, 18.

The plaintiff and Kelley initially enjoyed a cordial working relationship.  *See* Pl.'s Opp'n at 6-7.  In her first yearly performance evaluation, given in September 1999, Kelley rated the

plaintiff's work as "Commendable," the second-highest of five levels, and described her legal

analysis as "well researched, informative and factually supported." Pl.'s Opp'n, Ex. J at 2-9.

Soon, however, disputes began to arise between the plaintiff and Kelley. In October

1999, Kelley refused the plaintiff's request to take more than 1.5 days of paid leave, even though

she had allegedly accumulated more than nine days of leave. Pl.'s Decl. ¶ 9; Pl.'s Opp'n at 8-9.

The plaintiff also alleges that in January 2000, she worked almost 18.5 hours in one day while

accompanying Kelley to New York on an investigation, but that when the plaintiff sought

overtime authorization, Kelley laughed at her and refused to authorize more than eight hours of

pay for that day.[2] Pl.'s Decl. ¶ 13; Pl.'s Opp'n at 10.

The plaintiff and Kelley also had disputes regarding Kelley's apparent unwillingness to

appoint the plaintiff to a full-time position. *See* Pl.'s Opp'n at 15, 35-36. The plaintiff alleges

that when she was hired, there was an understanding that Kelley was going to seek authorization

to convert her position into a full-time position. Pl.'s Decl. ¶ 5. In the fall of 2000, however,

when Kelley first received such authorization, he elected to advertise the full-time position.

Def.'s Mot. at 25. Specifically, the defendant contends – and the plaintiff does not dispute – that

after several unsuccessful efforts, Kelley obtained the funding and authorization to hire full-time

counsel in October 2000. *Id*. On October 31, 2000, Kelley advertised the full-time position.

Def.'s Mot., Ex. 3. The defendant maintains that in January 2001, before Kelley could fill the

position, a new chairman joined the agency and imposed a formal hiring freeze. Def.'s Mot. at

25 & Ex. 49 at 1. Kelley posted the vacancy again in 2001, but was unable to fill the position

because the agency's chairman allegedly would not authorize the required funds. *Id*. at 25-26.

---

[2]       The plaintiff alleges that on both occasions the Office of Personnel Management ("OPM") and the Office of Resource Management ("ORM"), respectively, informed her that Kelley could not deny her the work hours and leave that she claimed. Pl.'s Decl. ¶¶ 9-11, 13-15; Pl.'s Opp'n at 10.

Over time, Kelley rated the plaintiff's performance at progressively lower levels.  In a June 2001 mid-year review, Kelley rated the plaintiff as "Fully Successful," the middle of five levels.  Def.'s Mot., Ex. 14.  On June 11, 2001, the plaintiff and Kelley met to discuss the evaluation.  Def.'s Mot., Ex. 15.  The defendant asserts that during this meeting, the plaintiff repeatedly interrupted Kelley and threatened to report the unsatisfactory performance review to "the people downstairs."  *Id.*  The plaintiff describes the encounter differently, noting Kelley's "derisive tone" and "hostility."  Pl.'s Decl. ¶ 17.  During this meeting, the plaintiff allegedly informed Kelley that she felt his criticism was not based on her work performance but rather on discrimination and improper bias, and that she was considering hiring an attorney to represent her.  *Id.*

The plaintiff states that although she did not initially perceive Kelley's hostile behavior towards her as discriminatory, Pl.'s Opp'n at 11, she "came to see over time that this [was] the way that Kelley treated women under his supervision, but not men."  *Id.* ¶ 16.  Indeed, the plaintiff alleges that Kelley had contentious relationships with many of his female employees.  Pl.'s Opp'n at 11-12.  Kimberly Hardy, an assistant office manager, testified that Kelley made inappropriate comments to her,[3] behaved like a "bully" and yelled at his female employees in a way that she could not recall him replicating with men.  Pl.'s Opp'n, Ex. A ("Hardy Dep.") at 19-20.  Deborah Parker, a senior auditor in the office, testified that Kelley did not have the same level of confrontations with male employees as he had with female staff.  Pl.'s Opp'n, Ex. B ("Parker Dep.") at 39.  Diane Grant, Kelley's longtime secretary, stated in her affidavit that "Kelley seemed to prey on single women."  Pl.'s Opp'n, Ex. D ("Grant Aff.") at 2.

---

[3]     For instance, Hardy testified that during one conversation she had with Kelley in his office, Kelley leaned across his desk and said to her, "[w]ell, if you act right, you won't have a worry in the world."  Hardy Dep. at 13.  Hardy also testified that Kelley was "very touchy."  *Id.* at 15-16.

The plaintiff alleges that when she confronted him about the June 11 evaluation, Kelley warned her not to bring her complaints to the attention of agency officials.  Pl.'s Opp'n at 12. Nonetheless, on June 13, 2001, the plaintiff wrote a memorandum to the ORM outlining her disagreement with the June 11 evaluation and alleging that Kelley's personal disdain for her prevented him from evaluating her performance objectively.  Def.'s Mot., Ex 16.  Five days later, on June 18, the plaintiff wrote a memo to Kelley expressing her disagreement with the performance evaluation.  Def.'s Mot., Ex 17.  That day, Kelley allegedly confronted the plaintiff, shouted at her and threatened to cut her hours nearly in half.  Pl.'s Decl. ¶ 18.

On July 1, 2001, Kelley informed the plaintiff that from then on, she would be required to leave the office at 5:00 p.m. each day because he did not want to be in the office with her without another employee present.  Pl.'s Opp'n at 12; Def.'s Mot. at 10.  The plaintiff testified during a November 2002 EEOC hearing that she had until that point been working until 5:30 p.m.  Pl.'s Opp'n, Ex. I ("EEOC Hr'g Tr.") at 336.  No other employee in the office had a similar restriction on their working hours.  Parker Dep. at 107-08.  The plaintiff contends that Kelley's new policy resulted in her schedule being reduced from 72 to 67.5 hours per two-week pay period.[4]  Pl.'s Decl. ¶ 18.  The plaintiff alleges that from that point forward, when she was not out of the office by 5:00 p.m., Kelley would yell at her and on at least one occasion asked if he was going to have to "throw her out."  *Id*. ¶ 19.  Shortly after the implementation of the policy, the plaintiff filed an informal EEO complaint against Kelley.  Pl.'s Decl. ¶ 22; Pl.'s Opp'n at 13.

By this time, the situation in the office was very tense.  Parker Dep. at 18-19.  Parker testified that on the day Kelley learned of the plaintiff's EEO complaint, he began arguing with

---

[4]   Kelley testified that that the plaintiff was free to arrive at work 30 minutes earlier each day and that he did not intend to cut her hours.  EEOC Hr'g Tr. at 336.

the plaintiff, and the situation became so volatile that Parker had to leave the office.[5]  *Id*.  The

plaintiff alleges that immediately after she informed Kelley of her informal EEO complaint,

Kelley went into his office and began loudly slamming drawers and file cabinets for an extended

period of time.  Pl.'s Opp'n at 13; EEOC Hr'g Tr. at 66-67.  Hardy testified that Kelley would

yell at the plaintiff in an inappropriate matter and that their encounters inevitably ended up in a

"shouting match."[6]  Hardy Dep. at 21.

In August 2001, Kelley issued a letter of reprimand to the plaintiff, citing two incidents

of alleged "insubordination."  *See* Def.'s Mot., Ex. 21 ("August 2001 Letter") at 1-3.  The first

involved the plaintiff's refusal to attend a meeting when instructed to do so and her inadequate

preparation for two interviews.  *Id*. at 1-2.  The second involved a confrontation between the

plaintiff and Hardy.  *Id*. at 2.  During the latter incident, the plaintiff confronted Hardy while

Hardy and Kelley were laughing together outside of Kelley's office.  Def.'s Mot, Ex. 2 ("Pl.'s

Dep.") at 86-88.  The plaintiff alleges that Kelley and Hardy were making fun of her.  Pl.'s Dep.

at 87.  Kelley testified that he feared a physical confrontation between the plaintiff and Hardy.

Pl.'s Mot., Ex. N ("Kelley Dep.") at 48-49.  Both the plaintiff and Hardy, however, characterize

the incident differently.  Pl.'s Decl. ¶ 23; Pl.'s Opp'n, Ex. O at 219.  During an EEO

investigation regarding the plaintiff's allegations, Hardy testified about the incident as follows:

> MR. KAUFMAN:      Maybe you could tell me what you know was going on.
>
> [HARDY]:    We had someone coming into the office for an interview and it
> was lunchtime and I went in to tell Mr. Kelley that I was going to the bank.  And
> he was telling me that I needed to limit my lunch hour.  And [the plaintiff]
> walked by and she asked me why was he talking about her to me.  And I said,

---

[5]     Parker testified that she left the office and walked to the General Services Administration, where
a nurse took her blood pressure.  Parker Dep. at 19.  She testified that after she returned, Kelley
"was upset about the fact that I went to GSA and told me that in the future, rather than leave the
building, I need to just go in my office and shut the door."  *Id*. at 19-20.

[6]     Hardy further testified that these conflicts resulted from Kelley's behavior.  Hardy Dep. at 21.

"Well, he wasn't talking about you, he was talking to me."  And she asked me again.  Then he told me to go ahead and go to lunch.

MR. KAUFMAN:      Okay.  Was that the extent of the incident?

[HARDY]:     As far as I remember it, yes.

MR. KAUFMAN:      Did that cause you any concern or did that bother you at all?

[HARDY]:     No.

Pl.'s Opp'n, Ex. O at 219.

In June 2002, Kelley issued the plaintiff a notice of "Unacceptable" performance in two of four critical elements of her position and placed her on a 90-day[7] Performance Improvement Plan ("PIP").  Def.'s Mot., Ex. 27 at 1.  The PIP stated that the plaintiff had failed to perform at an adequate level in two of three critical elements to her position: program monitoring and evaluation, and coordination of legal issues.  *Id.* at 2-3; Pl.'s Opp'n at 16.

Although the defendant contends otherwise, the plaintiff maintains that she never agreed to extend the PIP beyond the initial 90-day period.  Pl.'s Decl. ¶ 25; Def.'s Mot. at 17.  The plaintiff alleges that Kelley did not communicate with her about whether the PIP had ended or whether she had or had not fulfilled her performance requirements under the PIP until August 2003, more than a year after it was first imposed.  Pl.'s Opp'n at 15-17.  At that time, Kelley submitted a notice of removal proposing the plaintiff's termination based on her purported failure to satisfy her obligations under the PIP.  Pl.'s Opp'n, Ex. K; Kelley Dep. at 38-39.

The next month, however, the EEOC Hearing Examiner informally advised Kelley that she intended to rule that he had unlawfully retaliated against the plaintiff by issuing the June 2002 PIP and proposing her termination.  *See* Pl.'s Opp'n, Ex Q.  In December 2003, the EEOC

---

[7]     Although the June 2002 PIP stated that it was for a term of 60 calendar days, Def.'s Mot., Ex. 27 at 1, the plaintiff voluntarily agreed to extend the term for an additional 30 days due a family matter, Pl.'s Decl. ¶ 25.

Hearing Examiner again informed Kelley that she intended to rule in the plaintiff's favor.  *See* Pl.'s Opp'n, Ex. R.  Two months after receiving the second notice of advance ruling from the EEOC, Kelley withdrew the proposed termination.  Pl.'s Decl. ¶ 32; Pl.'s Opp'n, Ex. S.  One month later, in March 2004, the EEOC concluded that the PIP was retaliatory.  Pl.'s Opp'n, Ex. H at 12.

In April 2004, Kelley issued a second letter of reprimand to the plaintiff.  Def.'s Mot., Ex. 32 ("April 2004 Letter").  The letter addressed two incidents: one involved a dispute between the plaintiff and Janice Day Saint-Louis, an administrative office manager, and the other involved an encounter with Robert Stanton, a human resources officer with the agency.  *Id.*  The letter stated that the plaintiff behaved inappropriately and unprofessionally on both occasions, an assertion that the plaintiff disputes.  *Id.*; Pl.'s Decl. ¶ 23.

In October 2004, Kelley gave the plaintiff a yearly performance evaluation.  *See generally* Pl.'s Opp'n, Ex. T.  Kelley rated the plaintiff "Acceptable," the second-lowest of five levels.  *Id.* at 2.  Although the performance evaluation acknowledged certain areas in which the plaintiff's work performance had improved, it also identified specific areas of deficiency, noting that the plaintiff needed to rely more on her own research in providing legal advice to staff and that she needed to be more thorough in identifying potential legal and investigative issues.  *Id.* at 2-7.  The plaintiff appealed the evaluation to the Performance Rating Grievance Committee of the FHFB, which denied her grievance.  Def.'s Mot., Ex 8.  The plaintiff alleges that this poor evaluation caused her to be denied an automatic salary increase and precluded her from receiving a performance bonus.  Pl.'s Decl. ¶ 34.

The plaintiff alleges that throughout this period, Kelley repeatedly disparaged her in public and in front of her co-workers, denigrating her work as "shoddy" and poorly reasoned and

referring to her as "venomous" and a liar.  Pl.'s Opp'n at 20.  The plaintiff also alleges that

Kelley subjected her to ongoing verbal harassment in the form of demeaning and angry yelling

and shouting, and that after she filed her EEO complaint in mid-2001, Kelley began verbally

berating her with greater frequency.  EEOC Hr'g Tr. at 63-77.

In January 2005, the plaintiff left the FHFB and took a position as an Administrative Law

Judge with the Social Security Administration.  Pl.'s Decl. ¶ 37.  The plaintiff alleges, however,

that even after leaving the FHFB, Kelley continued to publicly denigrate her, suggesting that she

was the kind of person who would sue her own family.  *Id.*  The plaintiff also presents evidence

suggesting that Kelley pressured members of his staff not to support the plaintiff in her legal

actions, telling Parker that she needed to "choose which side [she] was going to be on – with him

or on the other side."  Parker Dep. at 32.  Parker testified that Kelley asked her to prepare a

memorandum for a promotion at the time she was informed that she would be deposed in this

case, but that after her deposition, Kelley refused to forward the memorandum to upper

management.  *Id.* at 28-29; Pl.'s Opp'n at 24.

### B.  Procedural History

Prior to the commencement of the instant actions, the plaintiff filed three EEOC

complaints.  *See* Compl. (Mar. 24, 2004) ¶¶ 8, 9, 14.  In July 2001, the plaintiff notified the

agency's EEOC director that she would be filing a complaint against the FHFB for race and

gender discrimination; she formally filed that complaint on September 20, 2001.  *Id.* ¶ 8.  On

June 16, 2003, the plaintiff filed a second complaint for disability discrimination after she

underwent hip replacement surgery.  *Id.* ¶ 9.  In November 2003, the plaintiff notified the agency

EEOC director that she would be filing a third complaint alleging retaliation for her two prior

EEOC complaints. *Id.* ¶ 13.  The plaintiff filed the third complaint on December 12, 2003.  *Id.*

On March 16, 2004, following the consolidation of the three EEO charges filed between 2001 and 2003, the plaintiff filed Civil Action No. 04-0423 in this court.  *See generally* Compl. (Mar. 24, 2004).  The plaintiff filed an amended complaint on June 23, 2004, alleging three counts of unlawful behavior on the part of the defendant: (1) age, race and gender discrimination; (2) disability discrimination and (3) retaliation.  *See generally* Am. Compl. (June 23, 2004).  On September 26, 2005, the court dismissed the plaintiff's discrimination and retaliation claims arising out of (1) the October 1999 denial of paid leave, (2) the January 2000 business trip to New York with Kelley, (3) the October 11, 2001 memorandum regarding the plaintiff's failure to follow office procedures, (4) the December 2001 "below standard" performance rating, (5) the June 2002 "unsatisfactory" performance rating, (6) the June 2002 PIP and (7) the August 2003 notice of proposed removal.  Mem. Op. (Sept. 26, 2005) at 11 & nn.4-6.  The court also dismissed the retaliation claims related to (1) the June 2001 performance review, (2) the August 2001 and April 2004 letters of reprimand and (3) the denial of permission to attend a training session because these acts did not constitute materially adverse employment actions.  *Id.*  Finally, the court dismissed the plaintiff's Rehabilitation Act cause of action for failing to state a claim upon which relief may be granted.  *Id.* at 15-16.  On December 12, 2007, the court granted in part the plaintiff's motion for reconsideration of its September 25, 2006 ruling and reinstated the plaintiff's claims arising out of the August 2001 Letter, the April 2004 Letter, and the June 2002 PIP.  Mem. Op. (Dec. 18, 2007) at 5.

On September 24, 2007, the plaintiff filed Civil Action No. 07-1693, alleging discrimination and retaliation based on the October 2004 performance evaluation and other harassing behavior to which she was allegedly subjected after filing her prior complaint.  *See generally* Compl. (Sept. 24, 2007).  On December 19, 2007, the court granted a joint motion to

consolidate the plaintiff's two complaints.  Order (Dec. 19, 2007).  On October 31, 2008,

following discovery, the defendant filed the instant motion for summary judgment.  *See*

*generally* Def.'s Mot.


## III. ANALYSIS

### A. Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540

(D.C. Cir. 1995).  To determine which facts are "material," a court must look to the substantive

law on which each claim rests.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

"genuine issue" is one whose resolution could establish an element of a claim or defense and,

therefore, affect the outcome of the action.  *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable

inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.

*Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere

existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  To prevail on a motion

for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make

a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  By pointing to

the absence of evidence proffered by the nonmoving party, a moving party may succeed on

summary judgment.  *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006).  Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."  *Greene*, 164 F.3d at 675.

Finally, the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary judgment motions in such cases with special caution.  *See Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), overturned on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (en banc); *see also Johnson v. Digital Equip. Corp.*, 836 F. Supp. 14, 18 (D.D.C. 1993).

## B. Gender Discrimination and Retaliation

### 1. Legal Standard for Disparate Treatment and Retaliation

To prevail on a claim of gender discrimination or retaliation, a plaintiff must follow the *McDonnell Douglas* framework.  *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003); *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) (applying the *McDonnell Douglas* framework to a Title VII retaliation claim).  The Supreme Court explained the framework as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection" . . . .  Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination . . . .

> The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations omitted) (quoting *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973)).

To establish a prima facie case of sex discrimination, the plaintiff must show that (1) he is a member of a protected class; (2) he was similarly situated to an employee who was not a member of the protected class and (3) he and the similarly situated employee were treated disparately. *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999). To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a statutorily protected activity; (2) a reasonable employee would have found the challenged action materially adverse[8] and (3) there existed a causal connection between the protected activity and the materially adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-69 (2006); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). The plaintiff's burden is not great: he "merely needs to establish facts adequate to permit an inference of [improper] motive." *Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001); *Burdine*, 450 U.S. at 253. If the plaintiff establishes a prima facie case, a presumption then arises that the employer unlawfully discriminated [or retaliated] against the employee. *Id.* at 254.

If the employer successfully proffers a legitimate, non-discriminatory and non-retaliatory reason for its actions, "the presumption raised by the prima facie case is rebutted and drops from the case." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal citation omitted);

---

[8]     In the retaliation context, the term "adverse action" "encompass[es] a broader sweep of actions than those in a pure discrimination claim." *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008). Thus, "[r]etaliation claims are 'not limited to discriminatory actions that affect the terms and conditions of employment' and may extend to harms that are not workplace-related or employment-related so long as 'a reasonable employee would have found the challenged action materially adverse.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 68 (2006)).

*Brady v. Office of the Sergeant at Arms, U.S. House of Representatives*, 520 F.3d 490, 494 (D.C. Cir. 2008) (noting that "the prima facie case is a largely unnecessary sideshow").  Upon such a showing by the defendant, the district court need resolve only one question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory [or non-retaliatory] reason was not the actual reason and that the employer intentionally discriminated [or retaliated] against the employee on the basis of race, color, religion, sex, or national origin [or protected activity]?"  *Brady*, 520 F.3d at 494.  In other words, did the plaintiff "show *both* that the reason was false, *and* that . . . discrimination [or retaliation] was the real reason[?]"  *Weber*, 494 F.3d at 186 (alterations in original and internal quotations omitted) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515).  The court must consider whether the jury could "infer discrimination [or retaliation] from the plaintiff's prima facie case and any other evidence the plaintiff offers to show that the actions were discriminatory [or retaliatory] or that the non-discriminatory [or non-retaliatory] justification was pretextual."  *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (quoting *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005)).  The court should assess the plaintiff's challenge to the employer's explanation in light of the totality of the circumstances of the case.  *Aka*, 156 F.3d at 1291.

    The strength of the plaintiff's prima facie case, especially the existence of a causal connection, can be a significant factor in his attempt to rebut the defendant's legitimate non-discriminatory or non-retaliatory reason for the adverse action.  *See Aka*, 156 F.3d at 1289 n.4 (stating that "a *prima facie* case that strongly suggests intentional discrimination may be enough by itself to survive summary judgment"); *Laurent v. Bureau of Rehab., Inc.*, 544 F. Supp. 2d 17, 23 n.5 (D.D.C. 2008) (holding that the plaintiff cannot establish pretext because "she is unable to show any causal connection"); *Meadows v. Mukasey*, 2008 WL 2211434, at *5-6 (D.D.C. May

29, 2008) (holding that the plaintiff demonstrated pretext in part by establishing a causal connection).  The plaintiff may establish a causal connection "by showing that the employer had knowledge of the employee's protected activity, and that the discriminatory [or retaliatory] personnel action took place shortly after that activity." *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)); *accord Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that the temporal connection must be "very close": a three- or four-month period between an adverse action and protected activity is insufficient to show a causal connection, and a twenty-month period suggests "no causality at all").

### 2. The Court Grants in Part and Denies in Part the Defendant's Motion for Summary Judgment on the Plaintiff's Retaliation and Gender Discrimination Claims

The plaintiff alleges that Kelley (1) discriminated and retaliated against her by reducing her hours in July 2001; (2) retaliated against her by issuing unwarranted letters of reprimand in August 2001 and April 2004; (3) discriminated and retaliated against her by imposing a PIP in June 2002; (4) discriminated and retaliated against her by giving her a poor performance evaluation in October 2004 and (5) discriminated and retaliated against her by refusing to appoint her to a full-time position.[9]  The court addresses these allegations in turn.

### a. July 2001 Reduction of the Plaintiff's Hours

The plaintiff alleges that Kelley discriminated against her on the basis of her gender and retaliated against her for engaging in protected activity by reducing her work hours from 72 to 67.5 hours per two-week period, a result of Kelley's policy requiring the plaintiff to leave the

---

[9]  Although the plaintiff initially alleged racial and age-based discrimination in addition to unlawful gender bias, *see generally* Compl. (Mar. 24, 2004), the plaintiff has abandoned these claims and makes no reference to those allegations in response to the defendant's motion for summary judgment, *see* Def.'s Mot., Ex. 62 (email from plaintiff's counsel to defendant's counsel confirming that the plaintiff is not pursuing claims premised on racial or age discrimination); *see generally* Pl.'s Opp'n.

office by 5:00 p.m. each day.  Pl.'s Opp'n at 43; EEOC Hr'g Tr. at 336.  The defendant asserts

that it had a legitimate reason for changing the plaintiff's hours.  Def.'s Mot. at 10.  Specifically,

the defendant maintains that Kelley required the plaintiff to leave the office by 5:00 p.m. because

he felt that he should not be in the office alone with her, given her inappropriate behavior during

their meeting over the June 2001 performance review.  *Id*.

Because the defendant has articulated a legitimate, non-discriminatory reason for the

action, the court forgoes an examination of the plaintiff's prima facie case and turns to the

central issue: whether the plaintiff has produced sufficient evidence for a reasonable factfinder to

conclude that the defendant's asserted justification was not the actual reason for the hours

reduction and that the defendant unlawfully discriminated against the plaintiff.[10]  *See Brady*, 520

F.3d at 494.  Here, the defendant has not presented any evidence regarding why Kelley felt he

should not be in the office alone with the plaintiff and made no allegations that she ever

threatened him physically.[11]  *See generally* Def.'s Mot.; Def.'s Reply.  In addition, the plaintiff

has presented evidence that even after implementing the 5:00 p.m. policy, Kelley continued to

take her on "stake outs" in his van and call her into the office after hours when they would be

alone together.  Pl.'s Decl. ¶ 19.  Given the evidence that Kelley continued to place himself in

situations in which he would be alone with the plaintiff even after imposing the schedule

restriction, the plaintiff has, at the very least, raised an issue of fact as to whether the defendant's

---

[10]    The court previously rejected the argument in the defendant's motion to dismiss that the hours restriction did not constitute a materially adverse employment action.  *See* Mem. Op. (Sept. 26, 2005) at 13-14.  The defendant does not revisit that issue in the instant motion, *see* Def.'s Mot. at 34, 36-38; Def.'s Reply at 15-16, nor does the plaintiff address the issue in her opposition papers, *see generally* Pl.'s Opp'n.  The court, therefore, declines to pass on the issue at this time.

[11]    Both Hardy and Parker testified that Kelley was a "big" man, Hardy Dep. at 25; Parker Dep. at 44, and bigger than anyone else in the office, Hardy Dep. at 12.  When asked if Kelley could have felt physically threatened by the plaintiff, Parker responded "[p]lease . . . .  If you looked at him and you looked at [the plaintiff] and the rest of us, I can't imagine him feeling physically threatened by [the plaintiff]."  Parker Dep. at 110.

asserted justification was the real reason for the hours restriction. *See Reeves*, 530 U.S. at 147

(observing that "proving the employer's reason false becomes part of (and often considerably

assists) the greater enterprise of proving that the real reason was intentional discrimination");

*Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009) (noting that "though evidence of pretext

is not *per se* sufficient to permit an inference of discrimination, it '[u]sually . . . will be enough to

get a plaintiff's claim to a jury'") (quoting *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir.

2005)).

 Moreover, this Circuit has observed that a reasonable jury may infer discrimination from

"independent evidence of discriminatory statements or attitudes on the part of the employer."

*Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (quoting *Aka*, 156 F.3d

at 1289); *see also Czekalski v. Peters*, 475 F.3d 360, 368 (D.C. Cir. 2007) (vacating summary

judgment for the employer in part because the plaintiff presented testimony from co-workers

indicating that her supervisor harbored gender bias). The plaintiff in *Czekalski* alleged that her

immediate supervisor discriminated against her on the basis of her gender when he reassigned

her to a new position with different responsibilities. *Czekalski*, 475 F.3d at 361-62. In addition

to evidence undermining the defendant's asserted non-discriminatory justification, the plaintiff

offered the testimony of co-workers that the supervisor harbored discriminatory attitudes towards

women.[12] *Id*. at 359. The Circuit vacated the grant of summary judgment in the employer's

favor, holding that "[w]hen viewed in conjunction with [the plaintiff's] strong evidence of

pretext, this testimony would permit a reasonable jury to rule in her favor." *Id*.

---

[12] One co-worker testified that the supervisor "just doesn't give women, that I have observed any
credibility for what they're saying, or even acknowledge they said it, in some cases." *Czekalski
v. Peters*, 475 F.3d 360, 359 (D.C. Cir. 2007). Another testified that the supervisor gave
preference to male employees in program responsibilities and, in one instance, was "cavalier and
rude" to a senior female administrator, displaying an attitude that implied that "[y]ou don't have
to worry your head about that." *Id*.

The plaintiff in this case has offered ample evidence of Kelley's gender bias.  The plaintiff testified that Kelley threatened only women and treated them differently than he did men.  Pl.'s Dep. at 120-21.  These assertions are reinforced by the testimony of other women in the office,[13] such as Hardy, who testified that Kelley treated the women in the office "very badly," EEOC Hr'g Tr. at 163, and yelled in a loud and threatening manner only at his female employees, Hardy Dep. at 18-19.  Hardy also testified that Kelley was a "bully," using his physical size and "screaming" to intimidate women in the office.  *Id.* at 12, 24.  Hardy further testified that Kelley behaved in a sexually inappropriate way, stating that he was "very touchy" with her and told her that if she "acted right," then she "wouldn't have a worry in the world."  *Id*. at 12-15, 47.

Deborah Parker, who also filed an EEO complaint against Kelley, testified that Kelley leaned over the desks of the women to intimidate them and "got in the face" of the women, but not the men.[14]  Parker Dep. at 43-44, 65-66.  Parker further testified that Kelley had fewer confrontations with his male employees.  *Id*. at 39.  Likewise, Diane Grant, Kelley's secretary, stated that Kelley "preyed on single women."  Grant Aff. at 2-3.

---

[13]     The defendant argues that the court should disregard the testimony of the plaintiff's co-workers because this testimony is inadmissible.  *See* Def.'s Reply at 8-11.  Yet, as the authority cited by the defendant makes clear, it would be entirely improper for the court to conclude on the limited facts before the court that this testimony is per se inadmissible.  *See Sprint/United Mgmt. Co. v. Mendelsohn*, 128 S.Ct. 1140, 1146 -1147 (2008) (observing that district courts may not apply a per se rule excluding "me too" evidence); *Elion v. Jackson*, 544 F. Supp. 2d 1, 8 (D.D.C. 2008) (concluding that "me too" evidence was admissible because "[i]t is established that evidence of an employer's past *discriminatory or retaliatory* behavior toward other employees may be relevant to whether an employer discriminated or retaliated against a plaintiff").

[14]     The defendant contends that the testimony of the plaintiff's co-workers lacks "foundation" because no male employees worked under Kelley while they were employed there.  Def.'s Reply at 9-10.  Yet during her testimony in the EEOC hearing, Parker identified two males who worked for Kelley during her tenure: Kirby Parker, a junior auditor, and Charles Hall, an intern.  EEO Hr'g Tr. at 25.  Moreover, this Circuit has observed that "[i]n order to prove discrimination . . . a plaintiff need not demonstrate that 'a similarly situated person outside [his] protected class [was] treated disparately.'"  *Ginger v. District of Columbia*, 527 F.3d 1340, 1344 (D.C. Cir. 2008).

The strength of the plaintiff's evidence of discrimination will depend to a considerable extent on the credibility of the testimony offered by these witnesses.  Indeed, the defendant has presented testimony from another witness suggesting that Kelley acted in a hostile manner towards all employees, male and female, as well as prior testimony from Hardy and Parker that arguably conflicts with the testimony on which the plaintiff relies.  *See* Def.'s Reply at 9-10. Nonetheless, the court may not evaluate witness credibility or weigh the relative strength of the evidence at this stage.  *See Czekalski*, 475 F.3d at 359 (noting that although the defendant offered testimony that the supervisor was rude and dismissive toward all employees, male and female, "[t]his is a dispute we cannot resolve without evaluating witness credibility and weighing the evidence, neither of which is appropriate at the summary judgment stage").  Thus, the court concludes that the plaintiff's independent evidence of Kelley's gender bias, coupled with the evidence undermining the defendant's asserted justification for the hours reduction, raises a genuine issue of fact regarding whether Kelley intentionally discriminated against the plaintiff by imposing the scheduling restriction.

The plaintiff has also presented evidence suggesting that her involvement in protected activity led to the hours reduction.  During the June 11, 2001 meeting regarding the plaintiff's mid-year performance review, the plaintiff allegedly informed Kelley that she believed that her performance review was discriminatory and that she intended to hire an attorney.  Pl.'s Decl. ¶ 17; EEOC Hr'g Tr. at 6-7.  This action constituted a protected activity within the meaning of Title VII.  *See Nguyen v. Gambro BCT, Inc.*, 242 Fed. Appx. 483, 490-91 (10th Cir. 2007) (observing that an employee's act of telling her supervisors that she would seek a lawyer to redress discrimination constituted a protected activity for purposes of her retaliation claim); *see also Connell v. Bank of Boston*, 924 F.2d 1169, 1178-79 (1st Cir. 1991) (holding that the plaintiff

engaged in a protected activity by retaining counsel and delivering a letter from his attorney to his supervisor stating that he intended to protect his rights regarding an adverse employment action); *cf. Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (noting that "[w]hile no 'magic words' are required, the complaint [to the employee's supervisors] must in some way allege unlawful discrimination, not just frustrated ambition").  Less than three weeks after the June 11 meeting, Kelley imposed the hours restriction. Pl.'s Opp'n at 12.  The close temporal proximity between the protected activity and the hours reduction supports an inference of a causal link. *See Cones*, 199 F.3d at 521 (holding that the temporal proximity between the plaintiff's EEO activity and the adverse action was sufficient to establish a causal connection for purposes of his retaliation claim).  Given the evidence suggesting a causal connection between her protected activity and the hours restriction, as well as the evidence that the defendant's asserted justification was pretextual, the court concludes that a reasonable jury could find that the defendant retaliated against the plaintiff by reducing her hours.

### b. August 2001 and April 2004 Letters of Reprimand

The plaintiff contends that Kelley unlawfully retaliated against her by issuing unwarranted letters of reprimand in August 2001 and April 2004. Pl.'s Opp'n at 14, 41.  The defendant maintains that these letters do not constitute actions sufficiently adverse to give rise to a retaliation claim. Def.'s Mot. at 38.  The defendant also argues that there is no evidence that the April 2004 letter was causally connected to any protected activity. *Id*. at 39.  Finally, the defendant asserts a legitimate, non-discriminatory justification for both letters – namely, the hostile and abusive workplace behavior of the plaintiff. *Id*. at 11-13; 19-21.

The court first considers whether the letters of reprimand are sufficiently adverse to support the plaintiff's retaliation claims.[15] *See Ginger v. District of Columbia*, 527 F.3d 1340, 1343 (D.C. Cir. 2008) (observing that because the defendant contended that the challenged action was not materially adverse and proffered a legitimate reason for the action, "[w]e analyze first whether the [action] was a sufficiently adverse action to support a claim under Title VII [and] then consider whether the [plaintiffs] have adduced sufficient evidence of . . . discrimination to put their case before a jury"); *Adesalu v. Copps*, 606 F. Supp. 2d 97, 103 (D.D.C. 2009) (noting that "[w]hile *Brady* directs the district court's focus to the employer's proffered non-discriminatory reason, the Court still first must determine whether plaintiff has suffered an adverse employment action").

Under the standard announced *Burlington Northern*, an action is sufficiently adverse to sustain a retaliation claim if it "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N.*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (noting that "we speak of material adversity because we believe it is important to separate significant from trivial harms"). Formal letters of reprimand may well, under certain circumstances, dissuade a reasonable worker from pursuing a discrimination claim. *Compare Walker v. Johnson*, 501 F. Supp. 2d 156, 173 (D.D.C. 2007) (concluding that a letter of reprimand which was to remain in the plaintiff's official personnel file for two years, "adding a level of severity to any future discipline that might occur in that time frame," could dissuade an objectively reasonable employee from participating in EEO

---

[15] In a prior ruling in this matter, the court concluded that "the two letters of reprimand – describing the plaintiff's behavior as threatening and verbally abusive and remaining in the plaintiff's personnel file for one year – [could serve] as a material disincentive for an employee wishing to initiate or support a charge of discrimination." Mem. Op. (Dec. 18, 2007). That determination, however, was based on a limited factual presentation – the parties had not submitted a copy of the August 2001 letter or provided any details regarding the circumstances of the April 2004 letter.

activity) *with Baloch*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (holding that letters of counseling and reprimand would not dissuade a reasonable employer from pursuing EEO activity because the letters "contained no abusive language, but rather job-related constructive criticism, which 'can prompt an employee to improve her performance'"); *see also Ram v. N.M. Dep't of Env't*, 2007 WL 5239192, at *36 (D.N.M. July 6, 2007) (observing that written warnings, letters of reprimand and performance development plans can be materially adverse actions for purposes of a retaliation claim under the *Burlington Northern* standard).

The August 2001 Letter describes the plaintiff as angrily confronting Hardy during the incident outside Kelley's office, August 2001 Letter at 2, a characterization that the plaintiff and Hardy dispute, Pl.'s Decl. ¶ 23; Pl.'s Opp'n, Ex. O at 219.  Although Kelley testified that he issued the letter because of the plaintiff's "aggressive statements and mannerisms" towards Hardy, Kelley Dep. at 45-47, Hardy testified that the incident was limited to the plaintiff asking her about the substance of her conversation with Kelley and did not cause her any concern or bother her at all, Pl.'s Opp'n, Ex. O at 219.  Furthermore, Kelley directed that the letter remain in the plaintiff's personnel file for one year.  *See* August 2001 Letter at 3.  Under these circumstances, the court concludes that questionable allegations of hostile and erratic workplace behavior, lodged in a formal letter of reprimand that remained in the plaintiff's personnel file for a year, could dissuade a reasonable employee from engaging in EEO activity.

Much of the August 2001 Letter details the hostile interactions between the plaintiff and Kelley leading up to two investigative interviews.  *See generally* August 2001 Letter.  Yet it is undisputed that Kelley had had numerous prior hostile interactions with the defendant, but never issued her a letter of reprimand until soon after she lodged an EEO complaint against him. Kelley Dep. at 46.  Indeed, Kelley testified that "there have been a number of other instances that

I had ignored, but because this involved some aggressive behavior towards another staff person, I decided – or when I talked to personnel, we agreed that something needs to be done." *Id.* Kelley's effort to justify his abrupt issuance of the letter on allegedly aggressive behavior that Hardy testifies did not concern her at all raises an issue of fact as to whether this asserted justification is pretextual. Furthermore, Kelley issued the August 2001 Letter just a few weeks after the plaintiff filed an EEO complaint against him. *See* August 2001 Letter at 3. Accordingly, the court declines to grant summary judgment on the plaintiff's retaliation claims arising out of the August 2001 Letter.

The plaintiff contends that like the August 2001 Letter, the April 2004 Letter mischaracterizes the plaintiff's legitimate work activities as hostile and inappropriate conduct. *See* Pl.'s Decl. ¶ 23; *see generally* April 2004 Letter. The April 2004 Letter detailed the plaintiff's allegedly hostile and abusive behavior during incidents involving an administrative office manager, a human resources employee and Kelley. *Id.* at 1-2. Unlike in the case of the August 2001 Letter, however, the plaintiff does not contend that any specific allegation contained in the April 2004 Letter is false. *See generally* Pl.'s Opp'n. Rather, her evidence of pretext is limited to the bald assertion that Kelley "mischaracterized what occurred [because] part of the issue was that I was simply attempting to get administrative support which I was rarely, if ever, able to receive from the office managers." Pl.'s Decl. ¶ 23. This conclusory assertion, devoid of factual support and contradicted by specific factual assertions in the affidavit of Saint-Louis,[16] does not raise an issue of fact with respect to whether the defendant's asserted justification was pretextual. Accordingly, the court grants summary judgment to the defendant on the plaintiff's retaliation claim based on the April 2004 Letter.

---

[16] The affidavit of Saint-Louis corroborates the allegations in the April 2004 Letter. Def.'s Mot, Ex. 33. The plaintiff does not address this affidavit in her opposition papers. *See generally* Pl.'s Opp'n.

### c. June 2002 Performance Improvement Plan

The plaintiff contends that Kelley discriminated and retaliated against her by placing her on a PIP in June 2002, which allegedly lasted until Kelley attempted to terminate her in August 2003. Pl.'s Opp'n at 40-42. The defendant argues that it is entitled to summary judgment on this claim because the June 2002 PIP was not a materially adverse employment action and lacked a causal connection to any protected activity engaged in by the plaintiff. Def.'s Mot. at 34, 39. Furthermore, the defendant asserts that even if the June 2002 PIP was materially adverse, it was fully justified. *Id.* at 16-19. Specifically, the defendant has offered two legitimate, non-discriminatory and non-retaliatory justifications related to the June 2002 PIP. *Id.* First, the defendant contends that Kelley legitimately placed the plaintiff on the PIP because of her poor work performance. *Id.* at 16-17. Second, the defendant contends that the plaintiff was not informed that the PIP was terminated until August 2003 because the parties agreed that any decision on the PIP should be "held in abeyance" pending mediation. *Id.* at 17-18.

This Circuit has held that, as with other purported adverse employment actions, placement on a PIP is not sufficiently adverse to support a disparate treatment claim unless it effects some "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (dismissing the plaintiff's disparate treatment claim because he presented no evidence that placement on the PIP affected his grade or salary); *see Oshiver v. Norton*, 2005 WL 3454336, at *13 (D.D.C. Dec. 16, 2005) (granting summary judgment to the employer because the plaintiff "failed to present any evidence that the negative reviews and placement on a PIP had any immediate tangible impact on her"). In this case, the plaintiff has failed to identify any significant change in her

employment status that resulted from her placement on the June 2002 PIP. *See generally* Pl.'s Opp'n. The plaintiff has presented no evidence that her placement on the PIP negatively impacted her grade or salary or had any other tangible impact on her employment. *See generally id.* Although the plaintiff contends that Kelley used the June 2002 PIP to justify his attempt to have her terminated in August 2003, *id.* at 40-41, no tangible action ever resulted from this attempt, *see* Def.'s Mot., Ex. 31. In addition, the plaintiff failed to exhaust her administrative remedies with respect to the August 2003 notice of termination, *see* Mem. Op. (Sept. 26, 2005), and she cannot resurrect that allegation through this claim, *cf. Taylor v. FDIC*, 132 F.3d 753, 765 (D.C. Cir. 1997) (observing that "an untimely suit 'cannot be revived by pointing to effects within the limitations period of unlawful acts that occurred earlier'"). Because she suffered no materially adverse consequences as a result of the PIP, the court grants summary judgment to the defendant on the plaintiff's gender-based disparate treatment claim based on the June 2002 PIP.

To sustain a retaliation claim, however, the plaintiff need only raise a genuine issue of fact as to whether her placement on the PIP would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68; *Rochon*, 438 F.3d at 1219. A PIP that does not rise to the level of a materially adverse action for purposes of a disparate treatment claim may still satisfy this more liberal standard. *See Chowdhury v. Bair*, 604 F. Supp. 2d 90, 96-97 (D.D.C. 2009) (holding that placement on a PIP was materially adverse in the context of a retaliation claim but not materially adverse for disparate treatment purposes because the PIP could dissuade a reasonable employee from engaging in protected activity even if it did not affect the employee's grade or salary); *Petroci v. Atl. Envelope Co., LLC*, 2007 WL 1993966, at *3 (E.D. Pa. July 3, 2007) (holding that a managerial employee's

placement on a PIP and probation satisfied the more liberal *Burlington Northern* standard because such actions could dissuade him from participating in protected activity).

The plaintiff avers that in June 2002, Kelley placed her on what was initially a 90-day PIP. Pl.'s Opp'n at 15. Yet the plaintiff alleges that over the next 14 months, Kelley never communicated to her whether she was or was not fulfilling her obligations under the PIP or indicated to her in any way that the PIP was at an end. *Id.* at 16; Pl.'s Decl. ¶ 25. The plaintiff alleges that the first time she received any indication that the PIP had come to an end was in August 2003, when Kelley issued a notice of removal based on her purported failure to perform under the PIP. Pl.'s Opp'n at 15-17 & Ex. F. In addition, Kelley conceded that he knew that the plaintiff was concerned for her job after she was placed on the PIP.[17] EEOC Hr'g Tr. at 461. Construing the facts in the light most favorable to the plaintiff, *Vulcan Arbor Hill Corp. v. Reich*, 81 F.3d 1110, 1125 (D.C. Cir. 1996), the court concludes that this treatment could dissuade a reasonable employee from pursuing a discrimination claim.

Turning to the central issue of the retaliation claim, *see Brady*, 520 F.3d at 494, the plaintiff argues that the defendant's asserted justification for placing her on the PIP in June 2002 – her poor work performance – was pretextual, citing the fact that Kelley's appraisal of the plaintiff for the rating period from September 2002 to October 2003 was at the "Fully Successful" level, Pl.'s Opp'n at 17 & Ex. G. Yet the PIP was imposed because of the plaintiff's allegedly substandard work performance in the first half of 2002. Def.'s Mot. at 16-17. Indeed, the defendant points out that federal regulations and agency policy required Kelley to place the plaintiff on the PIP because of the "Unacceptable" rating she received in her 2002 mid-year

---

[17] The defendant's contention that the PIP "by its own terms was not even a disciplinary action," Def.'s Reply at 12, is difficult to square with the fact that Kelley viewed the plaintiff's purported violation of the PIP as sufficient grounds to seek her termination, *see* Pl.'s Opp'n, Ex. F at 1.

review.[18]  Def.'s Opp'n at 16; Def.'s Reply at 13.  Moreover, the PIP details numerous specific deficiencies in the plaintiff's work performance, including her substandard investigation into the theft of an FHFB computer, a poorly prepared memo regarding the agency's compliance with the Rural Development Act, her failure to perform legal analysis of certain documents as requested and her failure to revise the office investigation manual for over two years, to name a few.  Def.'s Opp'n, Ex. 27 at 2.  The plaintiff offers no evidence to refute these specific allegations or to otherwise suggest that the defendant's asserted justification for placing her on the PIP was pretextual.  *See generally* Pl.'s Opp'n.

The defendant's justification for the duration of the PIP, however, is a different matter.  The defendant points to an e-mail from the plaintiff, dated September 18, 2002, Def.'s Reply, Ex. E, in which she proposed the "[s]uspension of [the] PIP for the duration of the mediation," and a memorandum from an agency official, dated September 25, 2002, which informed the plaintiff that a "decision" on the PIP would be stayed for approximately one month, until October 31, 2002, "pending the completion of mediation," Def.'s Reply, Ex. F.[19]  But while it appears that the mediation concluded at the end of October 2002 as expected, no decision was rendered on the PIP until August 2003.[20]  *See* Def.'s Mot. at 17 n.9.  In fact, in a memorandum dated December 20, 2002, Kelley informed the plaintiff that although the PIP completion date had passed, her "PIP [was] being held in abeyance" and that he did not feel the work she

---

[18]     The court previously dismissed all claims arising out the 2002 mid-year review.  Mem. Op. (Sept. 26, 2005) at 11 n.5.

[19]     The memorandum specifically provides that "[t]he mediation process, including selection of a mediator and mediation, should be complete by October 31, 2002.  If the mediation process is not complete by that date, *mediation will end* and the parties will request that the administrative judge set a new hearing date."  Def.'s Reply, Ex. F (emphasis added).

[20]     The mediation apparently concluded at the end of October 2002 because hearings were held in November before an administrative law judge.  Def.'s Mot. at 17 n.9.

performed on the PIP was complete.  Def.'s Mot., Ex. 29.  Indeed, Kelley's testimony at the

EEOC hearing indicates that he construed the PIP period as ending upon the completion of her

projects under the PIP, not at the end of October 2002.[21]  EEOC Hr'g Tr. at 460-62.  Under these

circumstances, the plaintiff could have reasonably believed that Kelley had yet to reach a

decision on whether she had satisfied her obligations under the PIP and that her obligation to

perform under the PIP, and the resulting threat of termination, was ongoing.

The timing of these events raises a question of fact as to whether the defendant withheld

a decision on the PIP at the end of October so that the prospect of termination would be hanging

over her head throughout the subsequent EEO proceedings, which began in November 2002.

Pl.'s Opp'n at 32-33.  Indeed, Kelley testified before the EEOC that he did not inform the

plaintiff that she had satisfied her obligations under the PIP "because of her involvement in the

litigation," without offering any explanation for why the litigation prevented him from

communicating this fact to her over the course of several months.  *See* EEO Hr'g Tr. at 460-62.

Kelley also wrote in his assessment that one of the ways in which the plaintiff failed to perform

under the PIP was "by repeatedly threatening legal action against [him] for giving feedback on

her work," which raises the inference that Kelley considered threats of legal action to be

inconsistent with the plaintiff's performance obligations.  Def.'s Mot., Ex. 27 at 4.  Construed in

the light most favorable to the plaintiff, this evidence raises an issue of fact regarding whether

Kelley allowed the June 2002 PIP to languish for more than a year in retaliation for the

---

[21]     When asked during the November 2002 EEOC hearing if the plaintiff was ever notified that the
PIP had ended, Kelley testified that "[w]ell, she has completed the work on the PIP." EEO Hr'g
Tr. at 460. Similarly, when asked why he never informed the plaintiff that the PIP period had
ended, Kelley testified that the plaintiff "knows that she had a time frame in which to submit her
projects under the PIP. She submitted those and so the PIP is over." *Id*. at 461. On December
20, 2002, Kelley transmitted the memorandum informing the plaintiff that the PIP was being held
in abeyance and he did not feel that the work she performed on the PIP was complete. Def.'s
Mot., Ex. 29.

plaintiff's involvement in protected activity against him.  Accordingly, the court denies summary judgment on the plaintiff's retaliation claim based on the June 2002 PIP.

### d. October 2004 Performance Evaluation

The plaintiff contends that Kelley discriminated and retaliated against her by giving her a poor yearly performance evaluation in October 2004.  Pl.'s Opp'n at 20-21, 36.  The defendant counters that the performance evaluation was not a materially adverse action because it did not affect the plaintiff's grade or salary.  Def.'s Mot. at 34.  The defendant also asserts that the 2004 performance evaluation was not causally connected to any protected activity.  *Id*. at 39.  Finally, the defendant avers that the plaintiff's October 2004 performance evaluation was warranted given the deficiencies in her work performance.  *Id*. at 35.

Although poor performance evaluations typically are not considered materially adverse, this Circuit has held that an evaluation that has a tangible impact on the plaintiff's employment, such as by precluding an employee from receiving a raise or bonus, can be materially adverse. *See Douglas v. Donovan*, 559 F.3d 549, 553 (D.C. Cir. 2009) (observing that a poor performance evaluation that resulted in the loss of an employment benefit such as a bonus or pay raise would cause a significant change in employment status sufficient to support a discrimination claim); *Weber v. Battista*, 494 F.3d 179, 184-85 (D.C. Cir. 2007) (holding that a poor performance evaluation was sufficiently adverse to support the plaintiff's retaliation claim because a reasonable jury could conclude that the poor evaluation precluded the plaintiff from receiving a performance award).  The plaintiff alleges that Kelley's 2004 performance evaluation precluded her from receiving an automatic increase in her salary and made her ineligible for a performance bonus.  Pl.'s Decl. ¶ 34.  The loss of these tangible employment benefits renders the PIP materially adverse for the purposes of the plaintiff's disparate treatment and retaliation claims.

The plaintiff, however, has offered no evidence calling into question the defendant's asserted non-discriminatory and non-retaliatory justification for the poor performance review. *See generally* Pl.'s Opp'n.  The October 2004 performance evaluation identified specific deficiencies in the plaintiff's work performance, noting, among other things, the lack of thoroughness in her review of a procurement report, her need to rely more on her own research in providing legal advice, the substandard quality of her update of investigative policies and the need to improve her responses to FOIA requests.  Pl.'s Opp'n, Ex. T at 2-7.  The plaintiff offers no rebuttal to these specific criticisms beyond the bare assertion that the performance evaluation "fail[ed] to account objectively for work contributions during the rating period."  *See id.* at 2; *see generally* Pl.'s Opp'n.  In addition, the plaintiff appealed this performance evaluation to a three-person grievance committee, which denied her grievance.  Pl.'s Decl. ¶ 34.

Furthermore, although the plaintiff did receive a poor rating overall, the narrative portion of the performance evaluation notes certain areas in which the plaintiff's work performance had improved, stating for instance that the plaintiff had been responding more positively to supervisory requests and had become more proactive in reviewing proposed agency policies and procedures.  Pl.'s Opp'n, Ex. T at 2.  The evaluation lacks the hostile and personally demeaning tone that might otherwise suggest that the evaluation stemmed from issues beyond the plaintiff's work performance.  *See generally id.*  For all these reasons, the court concludes that the plaintiff has failed to raise a genuine issue of fact as to whether the defendant's asserted justification for the 2004 performance evaluation was pretext, and grants summary to the defendant on this claim.

### e.  Non-Selection for a Full-Time Position

The plaintiff contends that the defendant discriminated and retaliated against her by failing to convert her part-time position into a full-time position, despite the fact that he had the

authorization and the funding for such a position in October 2000.  Pl.'s Opp'n at 15, 42-43.  The

defendant asserts that Kelley was unable to secure the requisite funding and authorization to fill

the position, and notes that, to date, Kelley still has not hired full-time counsel.  Def.'s Mot. at

24-25, 35; Def.'s Reply at 19-20.

As evidence of pretext, the plaintiff suggests that after posting the announcement of a

vacancy for a full-time counsel position on October 31, 2000, Kelley "cancelled" the

announcement on November 21, 2000, *see* Pl.'s Opp'n at 15, 43, two months before the January

2001 hiring freeze, *see* Def.'s Mot., Ex. 49.  Yet the plaintiff's allegation appears to refer to the

fact that the vacancy announcement stated that it would close on November 21, 2000.  *See* Def.'s

Mot., Ex. 48.  The plaintiff has presented no evidence suggesting that a three-week period was

unreasonably short (or indeed, that she suffered any prejudice as a result, given that she did

apply).  *See generally* Pl.'s Opp'n.  Moreover, the plaintiff's suggestion that Kelley was required

to make a final hiring decision within the vacancy period is unsupported by the record and

inconsistent with federal hiring practices, which typically involve the collection and review of

application materials, the rating and ranking of applicants and the compilation of a certificate of

eligible candidates followed by interviews.  *See* Def.'s Reply at 19-20.

The plaintiff's other argument regarding pretext is equally unpersuasive.  The plaintiff

contends that "to free up necessary funds [for a full-time position], Kelley either had to fire [the

plaintiff] or force her to resign."  Pl.'s Opp'n at 42.  Yet the plaintiff fails to articulate how this

fact, if true, indicates that his asserted justification for not selecting her (or anyone else) for the

full-time counsel position is pretextual.  *See generally id*.

Finally, contrary to her suggestion that she was somehow promised a full-time position,

Pl.'s Decl. ¶ 5, the plaintiff acknowledged during the EEOC hearing that she "was told right up

front that in every posting . . . [Kelley] would like to see each and every Finance Board

application posted generally for open competition," EEOC Hr'g Tr. at 59.  The plaintiff has

presented no evidence that the defendant's justification based on limitations on funding and

authorization was pretextual.  Accordingly, the court grants summary judgment to the defendant

on this claim.

### C. Hostile Work Environment

### 1. Legal Standard for Hostile Work Environment under Title VII

Title VII prohibits an employer from discriminating against any individual with respect to

compensation, terms, conditions, or privileges of employment because of race, color, religion,

sex, or national origin.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  Toward that end, an

employer may not create or condone a hostile or abusive work environment that is

discriminatory.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986).  Such an

environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation,

ridicule and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'"  *Singletary v. District of Columbia*,

351 F.3d 519, 526 (D.C. Cir. 2003) (quoting *Meritor*, 477 U.S. at 65, 67).  On the other hand,

"[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work

environment – an environment that a reasonable person would find hostile or abusive – is beyond

Title VII's purview."  *Harris*, 510 U.S. at 21.  Thus, to determine whether a hostile work

environment exists, the court looks to the totality of the circumstances, including the frequency

of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an

employee's work performance.  *Id*. at 23; *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88

(1998).  In considering the totality of the circumstances, however, the court is mindful that

> [e]veryone can be characterized by sex, race, ethnicity or (real or perceived) disability; and many bosses are harsh, unjust and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeal

*Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003) (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)).

Plaintiffs may also base a claim of hostile work environment on alleged retaliation.  *See Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006) (observing that "[i]n this circuit, a hostile work environment can amount to retaliation under Title VII"); *Nichols v. Truscott*, 424 F.Supp.2d 124, 141 (D.D.C. 2006) (noting that "[a] hostile work environment can give rise to a retaliation claim under Title VII").  To succeed on such a claim, the plaintiff must show that he was subjected to "'[retaliatory] intimidation, ridicule and insult' of such 'sever[ity] or pervasive[ness] [as] to alter the conditions of [his] employment and create and abusive working environment." *Hussain*, 435 F.3d at 366.  Furthermore, the plaintiff must establish a causal connection between the harassment and his protected activity in order to succeed on the claim. *See Nichols*, 424 F. Supp. 2d at 141.

### 2. The Court Denies the Defendant's Motion for Summary Judgment on the Plaintiff's Hostile Work Environment Claim

The plaintiff contends that Kelley created a hostile work environment by yelling at her, insulting her in front of her colleagues, denigrating her work and repeatedly taking adverse actions against her.  Pl.'s Opp'n at 44-45.  The plaintiff contends that this harassment was based both on her gender and on her involvement in protected activity.  *See* Compl. (Sept. 24, 2007) ¶¶ 55-67.  The defendant maintains that the plaintiff has not shown a pervasive pattern of conduct sufficient to support a hostile work environment claim.  Def.'s Mot. at 42.  The defendant argues that the plaintiff bases her hostile work environment claim largely upon

discrete acts of discrimination, including actions that the court previously dismissed. *Id.* The defendant further contends that the harassing acts of which the plaintiff complains constitute nothing more than ordinary workplace tribulations and are insufficient to support a claim of hostile work environment. *Id.* at 42-43.

The plaintiff has presented evidence that Kelley yelled loudly at her in an angry and threatening manner on repeated occasions, publicly ridiculed her work, stated to her co-workers that he would not be alone with her, imposed schedule restrictions specific to her and threatened to throw her out of the office for violating those restrictions. Pl.'s Opp'n. at 36, 44; Pl.'s Decl. ¶¶ 13, 18; Hardy Dep. at 20-21; Parker Dep. at 42-43, 105. Furthermore, Kelley allegedly threatened to cut the plaintiff's hours in half, allowed her to languish on a 14 month-long PIP and issued an allegedly unjustified letter of reprimand. *See* Pl.'s Opp'n at 11-26; Pl.'s Decl. ¶ 18; Pl.'s Opp'n, Ex. P at 11-12. As for the frequency of Kelley's outbursts, the plaintiff testified before the EEOC that she filed a complaint in June 2001, Kelley's "work criticisms accelerated, became more heated, became more personal." EEOC Hr'g Tr. at 70-71. The plaintiff testified that from that point, "[t]here was ongoing verbal harassment, shouting at me to get out of the office" and that the shouting accelerated after mid-June. *Id.* at 71-72. Hardy testified during her deposition that "every discussion [between Kelley and the plaintiff] . . . would end up being a shouting match" and that "[Kelley] would usually start the yelling." Hardy Dep. at 39. Parker testified that the plaintiff and Kelley would argue often. Parker Dep. at 40-41. Hardy further testified that Kelley was constantly yelling at his female employees and that "if you didn't do exactly what it was that he wanted you to do at that particular moment, he would yell at you. He would scream at you." *Id.* at 12. Grant states in her affidavit that she was "constantly berated and belittled" by Kelley. Grant Aff. at 3.

This evidence raises a question of fact as to whether Kelley subjected the plaintiff to severe and pervasive hostile conduct. *See Test v. Holder*, 2009 WL 1353721, at *9 (D.D.C. May 15, 2009) (denying summary judgment to the employer based on the plaintiff's allegations that his supervisors scheduled meetings when he would be unable to attend, verbally assaulted him, undermined his authority, issued an unfavorable performance evaluation, denied a performance award and refused to discuss his "individual development plan" with him because the combined effect of these actions could dissuade a reasonable worker from initiating EEO review); *Abdelkarim v. Tomlinson*, 605 F. Supp. 2d 116, 122 (D.D.C. 2009) (denying summary judgment on a hostile work environment claim because the plaintiffs' allegations that their supervisor routinely made derisive comments related to their national origin and background constituted an on-going pattern of hostility); *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 894-96 (D.C. 2009) (concluding that allegations that the plaintiff was subjected to "offensive, insulting language about women," "actions with sexual overtones that humiliated women," low performance evaluations and criticism directed at women, implying that their communication skills were less developed, was sufficient to support a jury determination that the plaintiff was subjected to a hostile work environment based on gender); *cf. Baloch*, 550 F.3d at 1201 (holding that the plaintiff's allegations of occasional verbal altercations and disciplinary actions were insufficient to raise a genuine issue of fact on the plaintiff's hostile work environment claim).[22]

Furthermore, the plaintiff has presented evidence that Kelley's behavior was linked to gender bias. As previously discussed, several other employees in the office testified that Kelley treated women differently from men, yelled at, harassed and bullied them in a way he did not do

---

[22]     Whereas the plaintiff in *Baloch* identified only four instances in which the employer yelled or spoke in a hostile manner, *see Baloch v. Norton*, 517 F. Supp. 2d 345, 360 (D.D.C. 2007), the plaintiff in this case has offered evidence that these verbal clashes were constant, even daily, *see* Hardy Dep. at 12, 39; EEOC Hr'g Tr. at 71-72.

with men, preyed on single women, was condescending and physically intimidating to women and made inappropriate sexual remarks to one female employee. *See* Hardy Dep. 12-15, 18-19, 24; Parker Dep. 39, 44; Grant Aff. 2-3. Although the defendant complains that the plaintiff has premised her hostile work environment claim upon discrete acts of discrimination, Def.'s Mot. at 42, the plaintiff has done more than simply "regurgitate . . . disparate treatment claims in an effort to flesh out a hostile work environment claim," *Smith v. Jackson*, 539 F. Supp. 2d 116, 138 (D.D.C. 2008). To the contrary, the plaintiff has presented sufficient evidence to raise an issue of fact as to whether the behavior to which she was subjected formed a pattern of discriminatory behavior meted out on the plaintiff and other women in the office. *See McKinney v. Dole*, 765 F.2d 1129, 1138 (D.C. Cir. 1985) (holding that a pattern of unequal treatment "that would not occur but for the sex of the employee" amounts to an "illegal condition" of employment under Title VII).

The defendant attempts to portray these incidents as clashes between two individuals who simply did not get along rather than discriminatory harassment of a subordinate by a superior. Def.'s Mot. at 29. Indeed, this interpretation finds some support in the deposition testimony of the plaintiff's co-workers. *Id.* Yet the plaintiff has presented evidence that Kelley instigated these conflicts through his yelling and aggressive and intimidating behavior and that this behavior pervaded the workplace and was linked to the plaintiff's gender. *See* Hardy Dep. 12-15, 18-19, 24, 39; Parker Dep. 39, 44; Grant Aff. 2-3. At this juncture, the court cannot conclude that a reasonable jury could not credit the plaintiff's characterization of the workplace environment. The court, therefore, concludes that a genuine issue of fact exists as to whether the actions complained of were severe and pervasive and "collectively constituted one 'unlawful employment practice'" based on the plaintiff's gender. *Nat'l R.R. Passenger Corp. v. Morgan*,

536 U.S. 101, 117-20 (2002).  Accordingly, the court denies the defendant's motion for summary judgment on the plaintiff's gender-based hostile work environment claim.

Turning to the retaliation-based hostile work environment claim, the evidence demonstrates that throughout the period in which these allegedly hostile actions occurred, the plaintiff was an active participant in EEO activity directed against Kelley.  *See* Pl.'s Opp'n at 11-14; EEOC Hr'g Tr. at 71-72.  The plaintiff alleges that Kelley began loudly slamming office furniture immediately after she informed him that she had initiated an EEO action against him, and warned her against bringing her grievances to others within the agency.  EEOC Hr'g Tr. at 66-67; Pl.'s Opp'n at 12.  The plaintiff testified that after learning of her EEO complaint against him, Kelley's shouting and criticism accelerated perceptibly.  EEOC Hr'g Tr. at 71-72.  Further evidence of Kelley's retaliatory intent is found in the testimony of Parker, who states that Kelley withdrew his support for her promotion after she testified on the plaintiff's behalf in this matter. *See* Parker Dep. at 28-32.  Viewed in the light most favorable to the plaintiff, a reasonable jury could infer on the basis of this evidence that Kelley's hostile behavior was motivated by the plaintiff's involvement in protected EEO activity against him.  Accordingly, the court denies the defendant summary judgment on this claim.

## IV. CONCLUSION

For the foregoing reasons, the court grants in part and denies in part the defendant's motion for summary judgment.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 29th day of June, 2009.


RICARDO M. URBINA
United States District Judge